NOT DESIGNATED FOR PUBLICATION

No. 116,245

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of S.R.

MEMORANDUM OPINION

Appeal from Johnson District Court; THOMAS E. FOSTER, judge. Opinion filed April 7, 2017. Affirmed.

*Andrew J. Jennings*, assistant district attorney, *Steven J. Obermeier*, senior deputy district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellant.

*Brant A. McCoy*, of Jones & McCoy, P.A., of Overland Park, for appellee.

Before LEBEN, P.J., POWELL and SCHROEDER, JJ.

*Per Curiam*:  After S.R., a juvenile, made inculpatory statements during a police interrogation without the benefit of a warning pursuant to *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), or the opportunity to consult with his mother or an attorney, S.R. was charged with one count of aggravated criminal sodomy. Prior to trial, S.R. moved to suppress those statements, and the district court granted the motion, finding the interrogation was custodial and the statements were involuntarily made. The State filed an interlocutory appeal, challenging both findings. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In late July 2015, a young boy reported to Merriam Police that S.R. had sexually abused him. The alleged victim was later interviewed by a social worker trained in

1

interviewing children. A Merriam police detective met S.R., who was then 13 years old, at his school to conduct a minimal facts interview. The purpose of the interview was for the detective to introduce himself to S.R. and learn a little about him. The next day, the detective met with S.R.'s mother and stepfather at their apartment and arranged for them to bring S.R. to the Gardner police station, which they chose over the Merriam police station, for another interview.

The following morning, S.R.'s mother and stepfather transported him to the police station. Before the interrogation began, the detective told S.R.'s mother and stepfather that they were welcome to be in the room during the interrogation but expressed that in his experience children often spoke more candidly when their parents were not present. The detective could not specifically recall whether he told S.R.'s mother and stepfather that S.R. had a right to an attorney. S.R. was not given a *Miranda* warning, and neither S.R. nor his mother and stepfather signed a *Miranda* waiver. The detective began the videotaped interrogation by telling S.R. that the room's door was unlocked, he was not under arrest, and he was free to leave whenever he wanted. Throughout the interrogation, the detective was armed, but S.R. was not handcuffed.

The detective and S.R. initially made small talk. Then the detective told S.R. about the alleged victim's accusations and said that the alleged victim was not lying. The detective continually encouraged S.R. to be honest, at one point telling him that people are usually more lenient or more forgiving towards those who are honest. The detective told S.R. that everyone makes mistakes and nothing he said would prevent him from leaving on his own. During the interrogation there were periods when S.R. was silent and when he was crying. S.R. was also uncomfortable using certain sexual words and phrases. Eventually, S.R. made some inculpatory statements. The detective then offered to read the alleged victim's accusations and told S.R. that he just had to say yes. S.R. confirmed that he and the alleged victim had engaged in sexual activity.

Once S.R. made the inculpatory statements, the detective switched his focus. The alleged victim also had suggested that S.R. might have been abused by his mother. So although he was a suspect, S.R. was also a potential victim. S.R., despite the detective's persistent questioning, denied being abused by his mother. He then told the detective that he wanted to go back to school and did not want to talk anymore, terminating the interrogation. The detective did not arrest S.R. but delivered him back to his mother and stepfather. The entire interrogation lasted about 1 hour and 40 minutes. Two months later, the State charged S.R. with one count of aggravated criminal sodomy.

S.R. filed a motion to suppress his statements, arguing that a *Miranda* warning was required because the interrogation was custodial, the statements were involuntary, and the statements were inadmissible hearsay. The State, without addressing the hearsay issue, responded that the interrogation was noncustodial and the statements were voluntary. The district court held a hearing on the motion, at which the detective testified and the video of the interrogation was played. After taking the motion under advisement, the district court issued a written decision granting S.R.'s motion, concluding that under the totality of the circumstances, the interrogation was custodial and S.R.'s statements were involuntary.

The State filed a timely notice of interlocutory appeal.

### DID THE DISTRICT COURT ERR IN FINDING THAT S.R.'S INTERROGATION WAS CUSTODIAL?

The Fifth Amendment to the United States Constitution and § 10 of the Kansas Constitution Bill of Rights guarantee the right against self-incrimination. *State v. Ninci*, 262 Kan. 21, 34, 936 P.2d 1364 (1997). To protect that right, states must employ procedural safeguards when a person is in police custody and subject to interrogation, and police must advise a suspect of the right to counsel and the right to remain silent.

3

*Miranda*, 384 U.S. at 479. If the suspect is younger than 14 years old, the suspect and the suspect's parent must both be advised of their rights, and the suspect must be allowed to consult with his or her parent or attorney. *In re B.M.B.*, 264 Kan. 417, 432, 955 P.2d 1302 (1998); see K.S.A. 2016 Supp. 38-2333(a).

Custodial interrogation is the questioning of a suspect by police while the suspect is in custody or while his or her freedom is deprived in any significant way. *State v. Warrior*, 294 Kan. 484, Syl. ¶ 1, 277 P.3d 1111 (2012). The prosecution must prove by a preponderance of the evidence that the suspect was not in custody when interrogated. See *State v. Lewis*, 299 Kan. 828, 836, 326 P.3d 387 (2014). We use a two-part inquiry to determine whether an interrogation was custodial. *State v. Morton*, 286 Kan. 632, 640, 186 P.3d 785 (2008). First, we consider the circumstances surrounding the interrogation. 286 Kan. at 640. Second, we determine, considering the totality of those circumstances, whether a reasonable person would have felt free to end the interrogation and leave. 286 Kan. at 640, 642-43. The district court's factual findings must be supported by substantial competent evidence, *i.e.*, "'legal and relevant evidence a reasonable person could accept to support a conclusion.'" *State v. Talkington*, 301 Kan. 453, 461, 345 P.3d 258 (2015). Whether the interrogation was custodial is reviewed de novo, and we do not reweigh evidence, assess witness credibility, or resolve conflicting evidence. *Lewis*, 299 Kan. at 835.

We weigh several factors when deciding whether an interrogation was custodial:

"(1) the time and place of the interrogation; (2) the duration of the interrogation; (3) the number of law enforcement officers present; (4) the conduct of the officers and the person subject to the interrogation; (5) the presence or absence of actual physical restraint or its functional equivalent, such as drawn firearms or a stationed guard; (6) whether the person is being questioned as a suspect or a witness; (7) whether the person being questioned was escorted by the officers to the interrogation location or arrived under his or her own power; and (8) the result of the interrogation, for instance, whether the person

4

was allowed to leave, was detained further, or was arrested after the interrogation." *Warrior*, 294 Kan. at 496.

These factors should not be mechanically applied, nor should equal weight be given to each factor. *Morton*, 286 Kan. at 640. "[E]ach case needs to be analyzed on its own facts; some factors will [be] present in one case and not in another, and the importance of each factor may vary from case to case." 286 Kan. at 640.

In instances when a child's age was known to the officer at the time of questioning, or objectively apparent to a reasonable officer, the age of the suspect is also a factor because "a reasonable child subjected to police questioning will sometimes feel pressured to submit when a reasonable adult would feel free to go." *J.D.B. v. North Carolina*, 564 U.S. 261, 272, 277, 131 S. Ct. 2394, 180 L. Ed. 2d 310 (2011).

Determining whether S.R.'s interrogation was custodial is a close call, and the facts surrounding the interrogation highlight the differences between how an adult may have viewed the situation versus a child. S.R.'s interrogation occurred around 8 a.m. at the Gardner police station. The district court did not find the time of the interrogation to be coercive. However, the interrogation did take place at a police station rather than at a neutral location, which generally points to the interrogation being custodial. See *Warrior*, 294 Kan. 484, Syl. ¶ 4; but see *State v. Trussell*, 289 Kan. 499, 507-08, 213 P.3d 1052 (2009) (citing several cases where interrogations took place at police stations but were not custodial). The interrogation lasted about 1 hour and 40 minutes, which also adds to the custodial nature of the interrogation, although there have been instances where longer interrogations have been held to be noncustodial. See *State v. Jacques*, 270 Kan. 173, 186-87, 14 P.3d 409 (2000). The detective was the only person who questioned S.R.

Before the interrogation began, the detective spoke with S.R.'s mother and stepfather. The record shows the detective told them that in his experience children speak

5

more candidly without a parent present but informed them that they were welcome to be in the room during the interrogation. The district court characterized these statements as the detective urging S.R.'s mother and stepfather to allow him to speak with S.R. alone. At the beginning of the interview, the detective also told S.R. that he was not under arrest, he was free to leave whenever he wanted, and nothing he said would prevent him from leaving on his own. S.R. was never restrained during the interrogation; the detective informed S.R. where the building's exit was located and that the interrogation room's door was unlocked. While the detective was armed during the interrogation, he never drew the weapon.

During the interrogation, however, the detective used an interrogation technique that involves isolating a suspect, telling the suspect he or she is guilty, and confronting the suspect with inculpatory evidence, which may just be a statement from another person. Moreover, the detective spent most of his time interrogating S.R. as a suspect; it was only when he was finished with the bulk of this questioning did the detective inquire whether S.R.'s mother had abused him. After denying that his mother had abused him, S.R. told the detective that he wanted to go back to school.

In the district court's view, S.R. did not terminate the interrogation but only proposed a way to leave, and the detective consented to ending the interrogation. The video shows that toward the end of the interrogation, S.R. told the detective he just wanted to go back to school. The detective asked when, and S.R. said, "Right now." The detective responded, "You don't want to talk to me anymore?" S.R. said, "No." The detective also said he did not want S.R. to regret not talking to him and that S.R. could contact him anytime. About a minute after S.R. said he did not want to talk further, both he and the detective left the room. S.R. was not arrested after the interrogation ended but was returned to his mother.

6

The district court concluded that the interrogation was custodial. The court specifically found that the detective controlled S.R., the contact and length of the interrogation, and whether it would end. The district court emphasized the young age of S.R., noting that the detective was aware of S.R.'s age due to having previous contact with him. The court also found that S.R. did not arrive at the police station voluntarily because he was transported there while in his mother's custody and that neither his mother nor stepfather were informed as to the true nature of the interview. The court criticized the detective's failure to recall whether he had informed S.R.'s mother and stepfather of S.R.'s right to an attorney, finding the detective should have recalled this as it was a key detail and should have been noted in the detective's records.

As we have stated, the question of whether S.R.'s interrogation was custodial is a close call, but ultimately, based upon a review of the totality of the circumstances, we agree with the district court's conclusion that the detective's interrogation of S.R. was custodial because the State failed to meet its burden. While an adult may have felt free to leave in this instance, the entire record suggests that S.R.—an immature child of 13 who was unfamiliar with the criminal justice system—did not feel free to leave. See *Haley v. Ohio*, 332 U.S. 596, 599, 68 S. Ct. 302, 92 L. Ed. 224 (1948) (in context of police interrogation, events that "would leave a man cold and unimpressed can overawe and overwhelm a lad in his early teens"). In particular, we agree with the district court's assessment that S.R.'s mother and stepfather bringing S.R. to the Gardner police station does not suggest voluntariness, especially given the fact that S.R.'s mother and stepfather were in the dark about why they were really there. It is difficult for us to envision S.R. refusing to speak with the detective once he was brought there by his parents. See *B.M.B.*, 264 Kan. at 432 ("We cannot ignore the immaturity and inexperience of a child under 14 years of age and the obvious disadvantage such a child has in confronting a custodial police interrogation."). The accusatory nature of the interview, coupled with it being held in a police station, only added to its coerciveness. The detective's interview of S.R. was a custodial interrogation, and we affirm the district court's finding on this point.

7

## DID THE DISTRICT COURT ERR IN FINDING THAT
## S.R.'S STATEMENTS WERE INVOLUNTARY?

"[T]hose interrogations that occur while a suspect is in police custody . . . 'heighte[n] the risk' that statements obtained are not the product of the suspect's free choice. [Citation omitted.]

"By its very nature, custodial police interrogation entails 'inherently compelling pressures.' [Citation omitted.] Even for an adult, the physical and psychological isolation of custodial interrogation can 'undermine the individual's will to resist and . . . compel him to speak where he would not otherwise do so freely.' [Citation omitted.] . . . That risk is all the more troubling . . . when the subject of custodial interrogation is a juvenile. . . .

. . . .

"[Accordingly,] this Court in *Miranda* adopted a set of prophylactic measures designed to safeguard the constitutional guarantee against self-incrimination." *J.D.B.*, 564 U.S. at 268-69.

Our Supreme Court has gone further and held

"that a juvenile under 14 years of age must be given an opportunity to consult with his or her parent, guardian, or attorney as to whether he or she will waive his or her rights to an attorney and against self-incrimination. Both the parent and juvenile shall be advised of the juvenile's right to an attorney and to remain silent. Absent such warning and consultation, a statement or confession cannot be used against the juvenile at a subsequent hearing or trial." *In re B.M.B.*, 264 Kan. at 432-33.

See also K.S.A. 2016 Supp. 38-2333(a) (no juvenile confession admissible unless prior consultation between juvenile's parent or attorney concerning right to attorney and against self-incrimination).

Here, it is undisputed that S.R. was not given any *Miranda* warnings, nor was he or his mother given the advisory warnings mandated by our Supreme Court in *B.M.B.* Given this, we are compelled to find that S.R.'s statements to the detective are inadmissible and, therefore, the district court did not err in suppressing the evidence.

Affirmed.